# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GERROD BELL,

Petitioner,

v.

RANDALL HEPP,

Respondent.

Case No. 18-CV-1439-JPS

**ORDER**

## 1.    INTRODUCTION

In 2001, Petitioner Gerrod Bell ("Bell") was charged in Monroe County Circuit Court with numerous felonies in connection with his sexual assault of two minors. (Docket #1 at 2). He was convicted by a jury and, in September 2002, was sentenced to life imprisonment.[1] (*Id.*) Bell initiated his direct appeal in 2015. (*Id.* at 3). The Wisconsin Court of Appeals affirmed his convictions in December 2016, and the Wisconsin Supreme Court affirmed that decision in April 2018. (*Id.*)

On September 13, 2018, Bell filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. (Docket #1). The Court screened the petition under Rule 4 of the Rules Governing § 2254 cases and permitted Bell to proceed on two habeas grounds: (1) the prosecutor's closing argument denied Bell due process of law by shifting the burden of proof from the State to him; and (2) Bell was denied the effective assistance of counsel when trial

---

[1]The Judgements of Conviction were amended on January 5, 2015 and February 24, 2015 in *State of Wisconsin v. Gerrod R. Bell*, 2001CF239 and 2001CF249 (Monroe Cnty. Cir. Ct.) *available at* https://wcca.wicourts.gov/ (last visited Sept. 2, 2021). (Docket #1; #12-1 at 1–4).

counsel allowed an unredacted police report of an interview with one of the two victims to be sent into the jury room during deliberations. (Docket #8 at 4–5). The parties[2] have fully briefed their respective positions on Bell's asserted grounds for relief. However, in Bell's reply brief, he states that he will not continue to pursue his second ground for relief regarding ineffective assistance of counsel and the unredacted document. (Docket #20 at 1). Thus, the Court will address only the merits of Bell's first ground for relief. For the reasons explained below, the Court finds that Bell's petition is without merit and, therefore, it must be denied.

## 2. BACKGROUND

### 2.1 Trial Proceedings

In 2001, the State of Wisconsin ("the State") charged Bell with sexually assaulting two victims—T.P., who was thirteen at the time of the assault, and her older sister, A.L., who was seventeen. (Docket #12-2 at 3–5). The State brought two cases against Bell in Monroe County Circuit Court, Case No. 2001CF239 and 2001CF249, and joined them for trial. (*Id.* at 4). With respect to T.P., the State charged Bell with (1) one count of second-degree sexual assault with use of force as a persistent repeater; (2) one count of second-degree sexual assault of a child as a persistent repeater; and

---

[2]Randall Hepp ("Hepp") has replaced Brian Foster ("Foster") as the warden of the institution where Bell is confined. Accordingly, the Court directs that Hepp be substituted for Foster as the respondent in this action. Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

Case 2:18-cv-01439-JPS   Filed 09/03/21   Page 2 of 26   Document 22

(3) one count of misdemeanor bail jumping as a repeater. (*Id.*) With respect to A.L., the State charged Bell with two counts of second-degree sexual assault by use of threat or force as a persistent repeater (Counts 1 and 2) and two counts of attempted second-degree sexual assault as a persistent repeater (Counts 3 and 4). (*Id.* at 4–5). Before submitting the case to the jury, the circuit court dismissed Counts 3 and 4. (*Id.*)

Bell was tried before a jury from September 23 to September 26, 2002. (Docket #12-6; #12-7; #12-8; #12-9). T.P. and A.L., among others, testified at trial. Bell did not. (Docket #1-1 at 3). The Wisconsin Supreme Court went into great detail regarding the statements made by the prosecutor and the defense in the trial, which are the basis for Bell's due process ground for relief. The Wisconsin Supreme Court's opinion includes the following relevant parts of the trial proceedings:

a.    Voir Dire

The prosecutor introduced the idea that people generally don't lie without reason early in the proceedings. He queried the prospective jurors closely on the truthfulness of teenagers and the reasons they might lie. For example, he asked if any of the prospective jurors had "ever known a teenager to lie[,]" whether anyone had "ever not known a teenager to have lied[,]" and "what are some of the typical things you might expect a teenager to lie about?". After hearing from prospective jurors who acknowledged that teenagers likely do lie in some circumstances but are less likely to do so in others, the prosecutor asked:

Would everybody agree here that—that, though, that if you're going to lie, you're going to have a reason like jealousy of some sort; there's going to be a reason why you would lie? Everybody agree with that? Everybody is nodding their head.

The prosecutor then asked "what are some reasons that a teenage girl might falsely accuse someone of sexual assault?" One juror responded that a teenage girl might lie for "attention," another answered "[l]ack of understanding of the gravity of accusing someone," another answered "revenge," and one prospective juror responded that teenage girls might lie about a sexual assault if they were afraid "that they'd get in trouble with their parents for having sex in the first place if they got caught." So the State asked the prospective jurors if they would "expect there would be some evidence that somebody would have a reason to lie? There would be some sort of evidence that this person would have a reason to lie about—[.]" Two prospective jurors responded that they would expect there to be some type of evidence that the person had lied. The State cautioned the prospective jurors they would hear jury instructions telling them that they would not be allowed to speculate and that their verdict would need to be based on evidence or the lack of evidence.

The defense was similarly interested in the prospective jurors' impression of teenagers' truthfulness. After asking each prospective juror the ages of their children, he asked "How many people believe that a child 14 years old, 18 years old can—can lie about a sexual assault?" He then reminded the prospective jurors that the prosecutor had mentioned the concept of someone omitting certain details and asked if "anybody [has] heard of lying by omission?" He pursued this theme as he inquired into: (1) whether the jurors believed that someone might lie because she does not understand the repercussions; (2) whether someone might tell a lie and then continue telling the lie because it is too difficult to backtrack; and (3) whether someone might "lie to gain attention because they want the love and attention from that person[.]"

b.      Opening Statements And Evidence Adduced at Trial

During his opening statement, defense counsel signaled that he would be concentrating on the victims' veracity. Part of his remarks referred to testimony that he said would establish T.P. had lied about the amount of alcohol she drank on the night of the assault, that she lied about the

assaults having occurred, that A.L. had admitted prior to trial that she previously lied about how much alcohol T.P. consumed the night of the assault, and concluded by telling the jury that "the evidence will show at the end of this, that in fact . . . [T.P.] and [A.L.] did not know what the truth is."

Central to the State's case was the testimony of T.P. and A.L., who testified extensively and in great detail about the sexual assaults. T.P. not only recounted details of the actual assault, she also described the circumstances surrounding it. So, for example, she testified that on the day Mr. Bell sexually assaulted her, she had multiple alcoholic beverages and felt intoxicated at some point during the evening. T.P. then explained that when her mother asked her to go make sure the bonfire was out, Mr. Bell came out and sat on the picnic table with her. She then gave a moment by moment description of how Mr. Bell sexually assaulted her. She said that, afterwards, Mr. Bell demanded that she tell no one what he had done and warned her that if she did, it would happen again.

Mr. Bell's counsel questioned T.P. closely. Part of the cross-examination focused on potential motives for lying. So, for example, he obtained T.P.'s admission that she "ha[d]n't had the best life" and that she had received comfort and attention from her mother, and others, after reporting the assaults. He also took direct aim at her credibility, getting her to admit she had previously lied about the amount of alcohol she had consumed on the night of the assault and that—despite her earlier statements—she was, in fact, intoxicated at some point that evening. T.P. also confirmed she had previously lied regarding the extent of her knowledge about sexual matters, and defense counsel also identified other discrepancies between T.P.'s trial testimony and her previous statements.

A.L. provided testimony both about the evening her sister was assaulted and about her own assaults. With respect to T.P.'s assault, she said there was alcohol at her (A.L.'s) birthday party, that she (A.L.) had "a slight buzz," and that T.P. had been drinking, too, and was "kinda tipsy." A.L. said

Case 2:18-cv-01439-JPS   Filed 09/03/21   Page 5 of 26   Document 22

she (A.L.) left the party at some point with Mr. Bell and three other men and that they were "getting stoned," and she explained that after the group returned to the house around 7:00 p.m., she and one of the other men left again around midnight. When she returned shortly thereafter, she noticed a change in T.P.'s countenance and described her as seeming more sober and "off to herself."

A.L. also testified that she herself had been sexually assaulted by Mr. Bell on four occasions. She said three of the assaults occurred around the time Mr. Bell assaulted T.P. The fourth assault (the one she did not originally report to the police) involved sexual intercourse (unlike the other three events). She said she did not initially report this assault along with the others because she was "ashamed to talk about" it and "didn't want to remember it." Additionally, she said Mr. Bell had threatened to do the same thing to her sister if she told anyone what had occurred.

During his cross-examination of A.L., Mr. Bell's counsel focused on her credibility. He questioned her about discrepancies between her trial testimony and the statements she gave to police and her preliminary hearing testimony as to what occurred on the night Mr. Bell had non-consensual sexual intercourse with her, and he also questioned A.L. about whether she had previously lied about how much alcohol she consumed on the night of T.P.'s sexual assault. A.L. confirmed she had previously lied about the amount she consumed because she was afraid of getting in trouble for drinking. A.L. also confirmed that after reporting the first three incidents involving Mr. Bell—which did not include sexual intercourse—she had lied to investigators when she told them that no other incidents had occurred. When asked whether her mother had been supportive of her after she had reported the fourth incident, A.L. confirmed that she had been and that her mother's support "was different" from what she had experienced in the past.

Dr. Ann Budzak, the pediatrician who examined T.P., also testified. She explained that although she performed a pelvic exam of T.P., she did not perform a forensic exam—

which would include collecting specimens such as hair and semen if possible—because the exam occurred approximately five weeks after the alleged assault. Dr. Budzak further testified that based upon a reasonable degree of medical certainty, there was evidence that T.P. may have had sexual intercourse at some point because she had tolerated the pelvic exam and because there was a lack of hymenal tissue. She also testified, however, that a lack of hymenal tissue "is not specific or proof of having had a penetration experience such as sexual intercourse" and that although that was generally the most common explanation for its absence or disruption, "there are other ways hymenal tissue can be disrupted[.]"

Through cross-examination, defense counsel elicited that Mr. Bell had told the police he had not assaulted T.P. and A.L. In an attempt to bolster the credibility of this statement, defense counsel called Sergeant Stickney as a witness to recount Mr. Bell's offer to undergo a Computer Voice Stress Analysis. According to Sergeant Stickney, measuring the stress in an individual's voice can help in determining whether the person is telling the truth. However, Sergeant Stickney never followed up on Mr. Bell's offer to take the test. Defense counsel also attacked A.L.'s credibility by calling a private investigator to explain how the physical layout of the bathroom where A.L. said she had been sexually assaulted contradicted her testimony.

### c. Jury Instructions

Prior to closing arguments, the circuit court instructed the jury, in relevant part, as follows:

> Consider only the evidence received during this trial and the law as given to you by these instructions and from these alone, guided by your soundest reason and best judgment, reach your verdict.
>
> . . . .
>
> The burden of establishing every fact necessary to constitute guilt is upon the State.

Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the defendant is guilty.

If you can reconcile the evidence upon any reasonable hypothesis consistent with the defendant's innocence, you should do so and return a verdict of not guilty.

The term "reasonable doubt" means a doubt based upon reason and common sense. It is doubt for which a reason can be given, arising from a fair and rational consideration of the evidence or lack of evidence. It means such a doubt as would cause a person of ordinary prudence to pause or hesitate when called upon to act in the most important affairs of life.

A reasonable doubt is not a doubt which is based on mere guesswork or speculation. A doubt which arises merely from sympathy or from fear to return a verdict of guilt is not a reasonable doubt. A reasonable doubt is not a doubt such as may be used to escape the responsibility of a decision.

While it is your duty to give the defendant the benefit of every reasonable doubt, you are not to search for doubt. You are to search for the truth.

The court defined evidence as: (1) "the sworn testimony of witnesses, both on direct and cross-examination"; (2) "exhibits the court has received"; and (3) "any facts to which the lawyers have agreed or stipulated or which the court has directed you to find." The court emphasized that the "[r]emarks of the attorneys are not evidence" and that while the jury should "[c]onsider carefully" the closing arguments, the attorneys' "arguments and conclusions and opinions are not evidence."

The court also identified the various factors the jury should consider in determining a witness's credibility and the weight to give the witness's testimony. Among the factors the court identified were "possible motives for falsifying testimony" and "all other facts and circumstances during the trial which tend to either support or to discredit the testimony." In doing so, the court instructed the jury to use "your common sense and experience. In everyday life you determine for yourselves the reliability of things people say to you. You should do the same thing here."

### d. Closing Arguments

As the prosecutor commenced his closing argument, he reminded the jurors of the instructions they had just heard. He then reprised the theme of his case: The jury shouldn't return a verdict of "not guilty" unless it believed T.P. and A.L. had lied:

> I think it's interesting to start from this point of view. What must we believe, what things must we believe for the defendant to be not guilty? After hearing all the evidence that we've heard, what are the things that we must believe true if he is not guilty?
>
> First of all, when it comes to [T.P.], who's 13 [sic], that she first lied to Sergeant Stickney about the defendant raping her. We have to believe that she then proceeded in the videotape that occurred over two days—one of those videotapes we saw, the first one—that she then lied to the social worker . . . about the rape. That the defendant, when the defendant assaulted her.
>
> We then have to believe that she lied to us. You have to believe that.
>
> We have to then believe when we look at [A.L.] and her testimony, we would have to believe if the defendant is not guilty, that she

first lied to Detective LaVern Erickson when she told him about the incident on the couch when the defendant held her down and grabbed her breast. And that the first thing that she came forward with.

The other instances when they were investigating the night of the party, we have to believe she lied about that.

At that point, trial counsel objected; however, the circuit court overruled the objection and the prosecutor resumed his argument:

We must believe that she [A.L.] lied to Detective LaVern Erickson about that. We must believe then six months later, for some reason, she just decided to pile on another story and that she lied to Sergeant Stickney when he said there was a pool of tears, there was a wet spot there when she got done testifying—or telling him about the rape in the shower on July 2d. We have to believe that she lied about that.

And we have to then believe that she lied at the preliminary hearing back in February of this year when she had to discuss both of those instances.

We have to believe that she lied to us over the course of two days when she was up there for a number of hours, that she intentionally lied to us this week. That's what we'd have to believe.

The prosecutor further argued that, to believe T.P. and A.L. were lying, the jury would have "to believe that those two girls, [A.L. and T.P.] are simply two of the best actors—or actresses we have ever seen. Could Meryl Streep have done any better? The reason their testimony is so compelling is because they weren't acting."

The prosecutor encouraged the jurors not to disbelieve the victims unless they found a motive to lie. He said that "if somebody is going to lie about something, they're going to have a reason. They're going to have some evidence of that reason." He argued that in this case, however, defense counsel had "no idea" why A.L. and T.P. might lie and that because he had no idea, he "just begins to speculate. He just begins to make guesses after he says he has no idea why [T.P.] would make this up." The prosecutor further argued that "[i]f a person lies about something, they must have a reason. And the reason why there is no evidence in this case about why anybody would lie is because they're not lying. [T.P.] and [A.L.] are not lying."

Defense counsel's closing argument focused exclusively on whether T.P. and A.L. should be believed. He argued that the police had not thoroughly investigated T.P.'s and A.L.'s allegations and that "much like the Salem Witch Trials of 1962 (sic), certain people were believed and that was it, that was all that was necessary. And apparently, unfortunately—unfortunately for [Mr.] Bell, that it was assumed that the girls were telling the truth." Trial counsel also juxtaposed A.L.'s testimony about the layout of the bathroom where one of the sexual assaults occurred with the testimony of the private investigator Mr. Bell hired to argue that A.L. had been lying and that she had "change[d] her story." Defense counsel's argument became even more pointed, asserting that "it [the sexual assaults] never happened. The reason why it doesn't make sense is it just didn't happen." Revisiting each of the victim's allegations, he told the jury "[t]his never happened" or "[i]t didn't happen."

Defense counsel also told the jury that A.L. and T.P. had ample motive to lie. He explained that in light of their "difficult life," "lying becomes easy" and eventually turns into "a way of survival." In regard to T.P., defense counsel argued that she had

> learn[ed] that she can manipulate what happens to her, she can manipulate not going to school, she can manipulate trying to get closer to mom

Case 2:18-cv-01439-JPS   Filed 09/03/21   Page 11 of 26   Document 22

and so lying becomes an easy thing. Lying can be a daily event for an individual like that, like protecting others, protecting themselves, can be a cry for attention, so I don't have to do something such as go to school, so they'll allow me to do something.

Lying can be out of jealousy, lying can be out of hurt, lying can be for revenge and a lie is out of control. And that's what's happened here. The lies have become so deep and so out of control that you can't bring it back. You can't expose what the truth is and that the truth that this never happened; you can't because you would be the scorn of all. And in fact, maybe her actions tell you so much by saying I don't want to pursue this thing.

Defense counsel further argued:

That's what this is all about; a life where lies don't mean anything, they don't mean anything to these girls because they've had to live that life the entire time. It's a way to protect themselves, it's their shield. And so it's easy for them that they can look you in the eye and I'm not lying, no, it was one wine cooler. . . .

. . . .

They put on a mask. He—[the prosecutor] talks about Meryl Streep and great actresses. They've had to act their whole life; . . . . They're crying for help; it's easy to act.

On rebuttal, the prosecutor dismissed defense counsel's theories about why A.L. and T.P. might lie as "[p]ure speculation, pure speculation, pure speculation" and argued that there simply was "no testimony that they were lying. There's no evidence that they were lying." The prosecutor also told the jurors that the jury instructions

precluded them from speculating and engaging in "sheer guesswork."

(Docket #12-2 at 12–23).

On September 26, 2002, regarding T.P., the jury found Bell guilty of (1) one count of second-degree sexual assault with use of force as a persistent repeater; (2) one count of second-degree sexual assault of a child as a persistent repeater; and (3) one count of misdemeanor bail jumping as a repeater. Regarding A.L., the jury found Bell guilty of two counts of second-degree sexual assault by use of threat or force as a persistent repeater. (Docket #12-1 at 1–4). On September 27, 2002, Bell was sentenced to life in prison without the possibility of parole. (*Id.*)

## 2.2 Post-Conviction Proceedings

On July 13, 2015, Bell filed a post-conviction motion to vacate the judgments of conviction and requested a new trial. (Docket #12-2 at 5–6). Bell's motion claimed that he did not receive a fair trial because: (1) the prosecutor's comments regarding motive and evidence of lying during closing argument shifted the burden of proof; and (2) the jury was allowed to view two inadmissible exhibits during deliberation. (*Id.*) The circuit court conducted a *Machner*[3] hearing at which trial counsel testified. (*Id.*) On December 1, 2015, the circuit court denied the postconviction motion from the bench at the close of the hearing and issued an order on December 4, 2015. (Docket #1-1 at 1). It held that the prosecutor did not shift the burden of proof; the argument was a reasonable response to the defense theory that the victims lied. (Docket #12-11 at 94–101). The prosecutor's arguments were unobjectionable "advocacy" that did not shift the burden of proof to

---

[3]*State v. Machner*, 285 N.W.2d 905 (Wis. Ct. App. 1979).

the defense. (*Id.* at 99–100). The circuit court concluded that no "harmful error occurred by way of the prosecutor's closing argument." (*Id.* at 98).

Bell appealed to the Wisconsin Court of Appeals on December 16, 2015. (Docket #1 at 3). The Wisconsin Court of Appeals affirmed on December 1, 2016. (Docket #1-1 at 2–22). Bell filed a petition for review with the Wisconsin Supreme Court on December 27, 2016. (Docket #1 at 3). The Wisconsin Supreme Court granted Bell's petition for review and affirmed the Wisconsin Court of Appeals decision on April 10, 2018. (Docket #12-2 at 1–59).

### 2.3    Federal Habeas Proceedings

On September 13 2018, Bell filed the instant petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 presenting two grounds for relief: (1) the prosecutor improperly shifted the burden of proof by arguing that the jury could not acquit Bell unless they found that the victims had lied; and (2) trial counsel was ineffective for asking that two exhibits be given to the jury in an unredacted form during deliberations. (Docket #1 at 6–7).

Bell did not file a brief in support of his petition. Respondent filed his brief in opposition to the petition on May 3, 2019, (Docket #17), and Bell filed a reply brief on June 24, 2019, (Docket #20). Respondent maintains that Bell has not satisfied his burden of proving that his claims merit relief under the deferential standards set forth in Section 2254. (Docket #17). In Bell's reply brief, he states that he will not continue to pursue his second ground for relief of the ineffective assistance of counsel claim regarding unredacted documents going to the jury. (Docket #20 at 1).

### 3.    LEGAL STANDARD

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. Under the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a prisoner in custody pursuant to a state-court judgment of conviction is entitled to federal habeas relief only if he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). With respect to claims adjudicated on the merits in state court, a federal court can grant an application for a writ of habeas corpus "only if the state court's decision was contrary to clearly established Supreme Court precedent, involved an unreasonable application of such precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in state court." *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010) (citing 28 U.S.C. § 2254(d)); *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013). A state-court decision is based on an unreasonable determination of the facts "when it 'rests upon fact-finding that ignores the clear and convincing weight of the evidence.'" *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)).

Case 2:18-cv-01439-JPS   Filed 09/03/21   Page 15 of 26   Document 22

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2005); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even 'clear error' will not suffice.'") (quoting *White*, 134 S. Ct. at 1702).

Indeed, the habeas petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *See id.* This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was

based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1); *Campbell*, 770 F.3d at 546. "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question *de novo*. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

**4.     ANALYSIS**

Bell is proceeding only on the first ground for relief in his petition: that the prosecutor's closing argument denied him due process of law. (Docket #20 at 1). In light of the standard of review, this Court must answer the following question: whether Bell has proven that the Wisconsin Supreme Court rejected his due process challenge to the prosecutor's closing argument in a manner that was contrary to, or involved an unreasonable application of, clearly established federal law; or in a manner that was based on an unreasonable determination of the facts in light of the evidence presented. As explained below, the Court finds that the answer is no.

There are two categories of statements by the prosecutor that Bell states violated his due process rights. The Wisconsin Supreme Court described the categories as the "must believe" statements and "motive" statements. (Docket #12-2 at 25). The Court will address each in turn.

### 4.1 "Must Believe" Statements

The "must believe" statements "comprised the prosecutor's statements that the jurors had to believe T.P. and A.L. were lying before they could find him not guilty." (Docket #12-2 at 25). The Wisconsin Supreme Court explained that "the prosecution and defense theories of the case were mirror-images: The prosecution said [the victims] were telling the truth, the defense said they were not. But they agreed that the resolution of that contest would decide the case." (*Id.* at 25–26). The Wisconsin Supreme Court noted that this was not a case of mistaken identity, or one where the victims' accounts failed to satisfy the "reasonable doubt" standard of proof. (*Id.* at 26). Bell's defense strategy was "reasonable, but narrowly focused" on challenging the victims' credibility, "and all of his efforts went into showing that [the victims] could not be believed." (*Id.*) The Wisconsin Supreme Court explained that this case involved the word of the two victims against Bell's word. There was no independent physical evidence. If the victims told the truth, "their testimony satisfied all of the elements of the crimes with which Mr. Bell was charged. Therefore, the only way Mr. Bell could have won an acquittal would have been to . . . convince the jury that the victims lied." (*Id.* at 28–29). In this scenario, the only way Bell could have been acquitted, assuming the jury believed the victims, was by jury nullification. (*Id.*) In a case such as this, "the jury's resolution of the case had to follow its conclusion regarding the victims' veracity." (*Id.*) Therefore, when the prosecutor stated that the jury "must believe" the victims' lied in

Case 2:18-cv-01439-JPS   Filed 09/03/21   Page 18 of 26   Document 22

order to acquit Bell, he was merely asking the jury to weigh the credibility of the witnesses, which was not improper. (*Id.*)

Bell states that the Wisconsin Supreme Court's conclusion that the prosecutor's "must believe" statements were not improper was contrary to established federal law. Specifically, Bell argues that federal case law establishes, that when a prosecutor argues the jury cannot acquit unless it finds the state's witnesses lied, the argument distorts the state's burden of proof, and such arguments are patently misleading. (Docket #20 at 3). In support of his argument, Bell cites to *Unites States v. Richter*, 826 F.2d 206 (2d Cir. 1987), *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978), *United States v. Cornett*, 232 F.3d 570 (7th Cir. 2000), *United States v. Briesno*, 843 F.3d 264 (7th Cir. 2016), and *United States v. Reed*, 724 F.2d 677 (8th Cir. 1984). (Docket #20 at 3–4). Further, Bell argues that the Wisconsin Supreme Court erred and was unreasonable in light of the facts of the case when it found that his case was analogous to *United States v. Amerson*, 185 F.3d 676 (7th Cir. 1999). (Docket #20 at 9). "Factually and legally *Vargas* and *Cornett* applied to this case, not *Amerson,* thus the state court's misapplication of the proper legal analysis was both unreasonable and erroneous." (*Id.* at 10).

However, the Wisconsin Supreme Court specifically addressed Bell's argument and thoroughly analyzed the case law and distinguished Bell's case from *Vargas* and *Cornett*. The Wisconsin Supreme Court found that the case was most similar to *Amerson* and *United States v. Sandoval*, 347 F.3d 627 (7th Cir. 2003).

> The authorities Mr. Bell cited do not persuade us because they are not in the same logical category as this case. In *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978), for example, the prosecution's case depended not just on the witnesses' honesty, but also on the accuracy of their

observations and the inferences they concluded from them. As the Seventh Circuit later characterized that case, the prosecutor's error was in telling the jury there was only one way to reach acquittal, when in fact the evidence gave them other paths to that end:

> Not content to let the jury decide the case according to the judge's instructions, he set up a "false dilemma" by informing the jury that they had to choose between two and only two options—either the defendant was lying or all the federal agents were lying—when in fact the jury had more options than only those two . . . .

*United States v. Amerson*, 185 F.3d 676, 687 (7th Cir. 1999) (citing *Vargas*, 583 F.2d at 387).

The prosecutor's argument in *United States v. Cornett*, 232 F.3d 570 (7th Cir. 2000), suffered the same deficiency as the one in *Vargas*. The *Cornett* jury could have acquitted the defendant on the charge he unlawfully possessed a firearm if it concluded that what the law enforcement officer observed did not amount to possession of a firearm. Because the jury could acquit without believing the officer had lied, the prosecutor's statement to the contrary was error. Likewise, the defendant in *United States v. Reed*, 724 F.2d 677 (8th Cir. 1984), faced multiple counts of wire fraud in which the State's case relied not just on the honesty of its witnesses, but the rational inferences one could derive from their testimony. Therefore, it was error for the prosecutor to argue that the jury could acquit only if the jury "determine[s] that [the defendant] is telling the truth and that all [the government witnesses] are lying to you." *Id.* at 681. As in *Vargas* and *Cornett*, the jury could have believed the witnesses but acquitted anyway because they did not agree with the conclusions the witnesses drew from what they observed.

We see support for the propriety of the prosecutor's trial commentary in the principles described in *Amerson* and *United States v. Sandoval*, 347 F.3d 627, 631-32 (7th Cir. 2003). In *Sandoval*, the prosecutor said "'Well, you would have to

conclude that the police officers were not telling the truth if you're going to accept the defendant's testimony.'" *Id.* at 632. The court said this was in the nature of "ask[ing] the jury to weigh the credibility of the witnesses." *Id.* Similarly, in *Amerson*, the prosecutor said the jury couldn't "'believe the testimony of these police officers and believe the defendant's testimony at the same time.'" 185 F.3d at 680. The *Amerson* court said this was "a mere statement of fact, which was no different than stating to the jury that they had a chance to determine whether the officers or the defendant was telling the truth and that it was up to the jury to determine who was more credible when applying the . . . jury instructions . . . ." *Id.* at 687.

 The key to both *Amerson* and *Sandoval* is that when the prosecutor's statements are fairly characterized as impressing on the jury the importance of assessing the witnesses' credibility, there is no error. That is the practical effect of the prosecutor's commentary in this case. The parties did not offer competing story lines, nor did the defense advance an alternative version of the events described by T.P. and A.L. There was the truth of the events the victims described, or the lack of truth. The verdict would necessarily follow the option chosen by the jury. Therefore, because Mr. Bell is in the category of cases in which the verdict will necessarily follow the jury's determination of the victims' credibility, the State's argument that the jurors should not find Mr. Bell not guilty unless they conclude T.P. and A.L. lied is equivalent to asking the jurors to carefully weigh the victims' credibility.

(Docket #12-2 at 28–32).

 The Court finds that the Wisconsin Supreme Court properly applied established federal law when it found that the prosecutor's statements were not improper in this situation. Further, the Wisconsin Supreme Court's application of federal law was reasonable given the facts of this case. Therefore, Bell has failed to establish that he is entitled to any federal habeas relief on the "must believe" statements.

### 4.2 "Motive" Statements

The "motive" statements contained those statements in which the prosecutor claimed that people generally do not lie without reason, and that if the victims had no motive to lie, they should be believed." (*Id.* at 25). The Wisconsin Supreme Court held that it was not improper for the prosecutor to argue that Bell failed to establish a motive for the victims to lie. The Wisconsin Supreme Court saw this as no more than the prosecutor's "encouraging the jurors not to disbelieve the victims unless they found evidence of a motive to lie," but the prosecutor did not tell the jurors they cannot disbelieve the victims unless there was a motive for them to lie. (*Id.* at 33).

Bell states that the Wisconsin Supreme Court's "conclusion that the prosecutor's improper 'motive' statements did not misstate the law or shift the burden of proof is plainly erroneous and unreasonable in light of the case as a whole and the applicable legal principles, and fair minded jurists would agree." (Docket #20 at 11). "The statements, which framed the state's entire case, misstated the law governing the jury's consideration of the evidence by shifting the burden to the defense to prove a motive for the girls to lie and unreasonable restricting what the jury may consider when assessing credibility." (*Id.* at 5).

The Wisconsin Supreme Court found that the prosecutor sought to persuade the jurors to believe the victims because there was no motive for them to lie; but he did not misstate the law by telling them they had to believe the victims unless there was a motive for them to lie. (Docket #12-2 at 33). The Wisconsin Supreme Court noted that both the prosecutor and defense counsel, from voir dire on, explored possible reasons why teenage girls might lie. (*Id.* at 33–34).

Defense counsel used cross-examination to suggest some motives for lying, including a desire for parental attention and sympathy, and avoiding responsibility for misdeeds. The statements that come closest to Mr. Bell's claim of error took place during closing arguments. There, the prosecutor made statements such as "if somebody is going to lie about something, they're going to have a reason. They're going to have some evidence of that reason." Additionally, he argued that "[i]f a person lies about something, they must have a reason. And the reason why there is no evidence in this case about why anybody would lie is because they're not lying." Defense counsel responded by describing various reasons the victims might have lied, including jealousy, hurt, revenge, and a perceived need for survival. The prosecutor, during rebuttal, told the jurors that defense counsel was inviting them to speculate about the motives to lie and that the jury instructions say they must not speculate.

(*Id.*) The Wisconsin Supreme Court found that all but one of the prosecutor's "motive" statements were observations about the common-sense principle that people do not lie without reason, and therefore, were persuasive and not improper. (*Id.* at 34).

The one "motive" statement that was a statement of law was the prosecutor's admonition that the jury instructions did not allow the jurors to speculate with respect to a witness's credibility. (*Id.*) Bell argued that this was a misstatement of law. (*Id.*) The Wisconsin Supreme Court rejected Bell's argument that the law allows the jury to speculate about witness credibility. (*Id.* at 34–35). "As in all other aspects of the case, the jury must consider the witness' testimony in light of the admissible evidence and reasonable inferences, all as directed by their 'common sense and experience.'" (*Id.* at 35). The Wisconsin Supreme Court found that:

The prosecutor did not shift the burden to Mr. Bell by encouraging the jury not to discount the victims' testimony in

the absence of a motive to lie. This was persuasion, not a statement of the law. Nor was his admonition that the jurors must not speculate, even with respect to matters of credibility, erroneous.

(*Id.* at 36). The Wisconsin Supreme Court concluded that neither the "must believe" nor "motive" statements were improper.

Even construed generously, Bell's brief merely contends that the Wisconsin Supreme Court got it wrong in their holdings on the "must believe" and "motive" statements. In other words, this habeas action is nothing more than a thinly veiled attempt at a "do-over" in this Court. Bell parrots precisely the same arguments he and his counsel have made all along, in the hope that this Court will disagree with those before it. This is not an appropriate use of a federal habeas petition. In any event, the Wisconsin Supreme Court's decision was far from unreasonable. Rather, it was entirely consistent with federal law. At the very least, Bell has come nowhere close to showing that all fairminded jurists would disagree with the Wisconsin Supreme Court's reasoning. He is not, therefore, entitled to any federal habeas relief.

**5.      CONCLUSION**

Bell has not shown that the Wisconsin Supreme Court incorrectly and unreasonably applied clearly established federal law in rejecting his due process claim. Likewise, Bell has not shown that the Wisconsin Supreme Court's decision rejecting his due process claim was based on an unreasonable determination of the facts in light of the evidence presented in state court. Bell's petition must, therefore, be denied and his case dismissed with prejudice.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the [habeas] applicant." To obtain a certificate of appealability, Bell must make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). For the reasons discussed above, no reasonable jurists could debate whether Bell's claims have merit. The Court will, therefore, deny Bell a certificate of appealability.

Finally, the Court closes with some information about the actions that Bell may take if he wishes to challenge the Court's resolution of this case. This order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within 30 days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more

than one year after the entry of the judgment. The court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Accordingly,

**IT IS ORDERED** that Petitioner Gerrod Bell's petition for a writ of *habeas corpus* (Docket #1) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability as to Petitioner Gerrod Bell's petition be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly

Dated at Milwaukee, Wisconsin, this 3rd day of September, 2021.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge